Transoceanic Terminal Corporation v. Commissioner.
Transoceanic Terminal Corp. v. Commissioner
Docket No. 42217.
United States Tax Court
1954 Tax Ct. Memo LEXIS 271; 13 T.C.M. (CCH) 227; T.C.M. (RIA) 54080; March 18, 1954
*271 The percentage used in 1947 and 1948 by petitioner in computing deductions for depreciation of industrial fork-lift trucks used in its stevedoring business was reasonable. John F. Lang, Esq., for the petitioner. Arthur L. Nims, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The respondent determined a deficiency of $4,277.09 in the income tax of petitioner for the fiscal year ended September 30, 1948, which is the taxable year here in question. The fiscal year ended September 30, 1947, is involved only as regards a net operating loss carried over from that year. The sole question to be decided is whether respondent was correct in reducing the allowable depreciation on petitioner's fork-lift trucks from 20 per cent to 10 per cent for 1947 and 1948. Other adjustments in the deficiency notice are not contested and will be reflected in the Rule 50 computation. The stipulated facts are incorporated herein by this reference. Findings of Fact Petitioner was organized under the laws of the State of New York on April 17, 1946, and commenced operations as a stevedoring contractor on or about October 1, 1946. It maintains its principal *272 office and place of business in New York City. Petitioner files its corporate income tax returns on the basis of fiscal years ending September 30. The return for the year ended September 30, 1948, was filed with the collector for the second district of New York. Petitioner operates a fleet of motorized vehicles used in the loading and unloading of ships of the Belgian line in New York harbor. It began its operations with old equipment acquired from Atlantic Overseas Corporation, which equipment is not here in question. Between November, 1946, and March, 1948, petitioner bought 12 new fork-lift trucks on which it took deductions for depreciation at the rate of 20 per cent in its tax returns for the fiscal years ending in 1947 and 1948. The equipment was often used up to 16 hours a day. The operators of the lift trucks were selected by the union and were under the supervision of a union foreman. The taxpayer had little control over these men. The operators were extremely careless, taking no pride in the equipment. The trucks were used on rough and uneven pier surfaces and were frequently overloaded by the operators, resulting in bent frames, forks, axles, broken hydraulic cylinders *273 and general breakdown. After five years of such use, it was more economical and efficient to purchase new equipment than to continue making the major repairs necessary to keep the trucks in operation. As of October, 1953, the petitioner had disposed of eight of the fork-lift trucks which it purchased during the years under consideration, as shown in the following table: Cost of
Vehicle
Date
Replacement
No.
Cost
Disposed
Allowance
Vehicle [1]
2
$3,748.88
7/31/53
$1,800.00
$7,979.77
3
3,522.86
7/31/53
1,800.00
7,979.77
4
3,692.70
7/31/53
1,800.00
7,979.77
5
3,861.99
Oct. 1953
1,900.00
7,800.00
6
3,707.02
7/14/50
2,300.00
6,050.24
7
3,707.03
7/14/50
2,300.00
6,050.24
8
3,826.79
Oct. 1953
1,900.00
7,800.00
11
4,068.45
7/31/53
1,800.00
7,979.77 These trucks were disposed of on an average of 68 months after acquisition. Petitioner was able to obtain trade-in allowances considerably in excess of the actual value of the equipment traded in. By 1953, prices for equipment of the type in question were substantially higher than in 1947 and 1948. *274 Some of the replacement vehicles were of larger capacities than the trucks traded in. Among the new vehicles were the first four diesel powered trucks bought by petitioner. The seller granted unusually high trade-in allowances in order to demonstrate the suitability of diesel power to petitioner's operations. The 12 lift trucks in question had a useful, economic life of not more than five years. Opinion ARUNDELL, Judge: The single issue to be decided is an uncomplicated and factual one. We are asked to determine whether petitioner properly computed the depreciation deduction on its fork-lift trucks during the years in question on the basis of a useful life of five years. Section 23 (1) permits the deduction of "A reasonable allowance for the exhaustion, wear and tear * * *" of property used in a trade or business. It is respondent's position that a 20 per cent deduction was not reasonable and that petitioner was entitled to deduct only 10 per cent annually, based on a useful life of 10 years. We are of the opinion that the five-year basis employed by petitioner was reasonable and proper. Competent witnesses, with many years of experience with the problems of stevedoring *275 in general and petitioner's situation in particular, testified that five years was the maximum efficient and useful life of the equipment in question under the conditions of its use. It is clear from the record that these particular machines were given unusually hard treatment. Petitioner was forced to accept whatever operators were sent by the union and they frequently overloaded and otherwise misused the equipment, having no regard for its proper maintenance. The pier surfaces were rough and uneven, resulting in more wear and tear than would ordinarily be expected and the trucks were in use under these conditions up to 16 hours a day. Respondent's contention that the trucks should have been depreciated on a ten-year basis has been computed by the use of mathematical formulae. His figures are derived from a comparison of average costs not recovered through salvage to average age at disposal. We think, however, that there is a basic fallacy in his application of this method. Respondent treats the average amount received as a trade-in allowance as salvage value in reducing average cost. The trade-in allowance is not, in our opinion, a reliable or even realistic measure of the actual *276 value of the equipment traded in. The evidence shows that the cost of equipment of this type had become highly inflated by 1953 when most of the trade-ins were made, and that in some cases the replacement vehicles were of heavier capacity than the ones traded. Furthermore, in the case of four of the new trucks, the dealers were willing to give extraordinarily high trade-ins in order to effect the sale of the first diesel powered lift trucks to petitioner. All of these factors had a tendency to raise the amount of the trade-in allowances without any relation whatsoever to the actual value of the old equipment. It follows that respondent erroneously disallowed depreciation deductions at a 20 per cent annual rate on the equipment in question. Decision will be entered under Rule 50. Footnotes
1. The trade-in allowance was deducted from this figure.↩